# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, <br><br> *Plaintiff,* <br><br> v. <br><br> AMERICAN AIRLINES, INC.; QURIUM SOLUTIONS, INC. (D/B/A SUPPLIER.IO), <br><br> *Defendants.* | Case No. 25-125 |

## COMPLAINT

1.      "[R]acial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). The Reconstruction Congress understood this fact when it passed the Civil Rights Act of 1866, which "prohibit[s] any racial discrimination in the making and enforcement of contracts." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 288 (1976). Better known as §1981, this statute guarantees all Americans the "same right" to contract, 42 U.S.C. §1981(a), protecting the "equal right of all persons" to "make and enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006).

2.      American Airlines and Supplier.io are thwarting §1981 by running a supplier-diversity program that inks contracts with some races but not others. Headquartered in Fort Worth, American is the largest airline in the world. And functionally headquartered in Texas, Supplier.io runs the supplier-diversity programs of 50% of the Fortune 100.

3.      Under American's supplier-diversity program, the airline awards six-figure con-tracts to hundreds of businesses every year. In exchange for a shot at those contracts, partici-pants must license away their intellectual property, insulate American from liability, and more.

4.      Eligibility for the program depends on race. According to American, businesses "must be at least 51% owned, operated and controlled by one of these groups: Minority (Black, Asian American and Pacific Islander, Hispanic, Native American), Women, LGBTQ, Disability, Veteran, [or] Service-disabled veteran." *Supplier Diversity*, American Airlines (archived Jan. 14, 2025), perma.cc/5RCV-WUAF. So some races—like blacks, Asians, and Native Americans—can always apply. *Id.* But other races usually can't. *Id.*

## Supplier diversity process

### ⌃ Who qualifies?

### Corporate Certified Program

To qualify as a diverse supplier in our Corporate Certified Program, your company must be certified by a valid council or government agency every year. To become certified, your company must be at least 51% owned, operated and controlled by one of these groups:

- Minority (Black, Asian American and Pacific Islander, Hispanic, Native American)
- Women
- LGBTQ
- Disability
- Veteran
- Service-disabled veteran

5.      This kind of discrimination was never lawful, even before *Harvard* held that colleges can't use race in admissions. But in case American needed a reminder, *Harvard* reaffirms that "[e]liminating racial discrimination means eliminating all of it." 600 U.S. at 206. No racial discrimination is benign: It always "demeans the dignity and worth" of every American "to be judged" by his race instead of by his "own merit and essential qualities." *Id.* at 220.

6.      That principle is true under the Constitution, true under 42 U.S.C. §1981, and true under Title VI—another statute that bars federal-funding recipients like American and Supplier.io from racially discriminating. Because American's program discriminates on its face, it violates §1981 and Title VI.

7.      The Alliance has members who are being excluded from the program and discriminated against because they are the wrong race. It's entitled to relief.

## PARTIES

8.      The American Alliance for Equal Rights is a nationwide membership organization that is dedicated to ending racial classifications and racial preferences in America.

9.      The Alliance was founded in 2021. It was approved by the IRS as a 501(c)(3) tax-exempt organization the same year.

10.     Edward Blum is the Alliance's president; Wai Wah Chin is its secretary; and Jay Bergman is its director.

11.     The Alliance has more than 250 members, and its membership continues to grow.

12.     The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join the Alliance. They pay dues. They receive regular updates. And they offer input on the Alliance's litigation and other activities.

13.     The Alliance has members who are ready and able to apply to American's supplier-diversity program, including Members A and B. These members have authorized the Alliance to vindicate their rights in this suit, and the Alliance represents them in good faith.

14.    American Airlines is the world's largest air carrier. American is headquartered in Fort Worth, Texas. *See Spence v. American Airlines,* 2025 WL 225127, at *6 (N.D. Tex. Jan. 10) (O'Connor, J.). It created the supplier-diversity program. *Supplier Diversity.*

15.    Supplier.io is a software company that runs "supplier diversity and ESG initiatives … around the world." *Smarter Responsible Supplier Diversity*, Supplier.io (archived Jan. 24, 2025), perma.cc/FL2B-FSRQ. Supplier.io runs American's supplier-diversity program. *Sustainability Report 2022* 39, American Airlines (2022), perma.cc/C3LQ-JWPR. Supplier.io's nerve center is Texas, where its CEO, CFO, General Counsel, and other senior staff live and work. As part of American and Supplier.io's operating agreement, Supplier.io provides American with an exclusive online platform that's open only to minorities, women, and a few other preferred groups. *Id.* The parties' agreement—which requires substantial performance in Texas—continues today. *Id.*

## JURISDICTION AND VENUE

16.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case "aris[es] under the … laws … of the United States."

17.    This Court has personal jurisdiction over American. The Court has general, personal jurisdiction over American because the airline is headquartered in this district. *American Airlines,* 2025 WL 225127, at *6. And the Court has specific, personal jurisdiction over American because the program is based in this district, staffed in this district, and one of the Alliance's standing members—Member B—lives in this district.

18.    This Court has personal jurisdiction over Supplier.io. The Court has general, personal jurisdiction over Supplier.io because, although it claims to be an Illinois company, its

never center is in Texas. Its chief executive officer lives and works in Dallas. *Aylin Basom LinkedIn Profile* (archived Jan. 22, 2025), perma.cc/XTR2-ND5F. Its general counsel lives in Dallas, works in Dallas, and is licensed to practice law in Texas. *Dominic (DJ) Merino Profile* (archived Jan. 22, 2025), perma.cc/2G4F-EA9J; Texas Bar, *Dominic James Merino* (archived Jan. 23, 2025), perma.cc/UQ7S-BNXW. And its chief financial officer lives and works in McKinney. *Aaron Lawler LinkedIn Profile* (archived Jan. 22, 2025), perma.cc/2T5T-FLMT.

19.      Other key employees work in Texas too. Supplier.io's head of growth and demand generation lives and works in the "Dallas-Fort Worth Metroplex." *Charles Summers LinkedIn Profile* (archived Jan. 22, 2025), perma.cc/E8AR-6CF5. Supplier.io's senior director of IT and security lives and works in the "Dallas-Fort Worth Metroplex." *Matt Rogers LinkedIn Profile* (archived Jan 22, 2025), tinyurl.com/ykbkwebc. The company's customer success manager, lives and works in "Grand Prairie." *Honey Gonzales LinkedIn Profile* (archived Jan. 22, 2025), tinyurl.com/yjuvv5dz. And the list goes on.[*]

20.      This Court also has specific, personal jurisdiction over Supplier.io. The company works with American, which is headquartered in this district. It runs American's supplier-diversity program, which was created in this district, staffed in this district, and is overseen in this district. And as the Alliance already mentioned, one of its standing members—Member

---

[*] Patrick Gamble, Supplier.io's "Customer Success Manager" lives and works in the "Austin, Texas." *Patrick Gamble LinkedIn Profile* (archived Jan. 22, 2025), tinyurl.com/3w5ejmrb. Carmen Bandy, Supplier.io's "Client Growth Account Executive," lives and works in "Houston, Texas." *Carmen Bandy LinkedIn Profile* (archived Jan. 22, 2025), tinyurl.com/35y9yaux. Sheyna Treiber, Supplier.io's "Senior Demand Generation Manager" lives and works from "Austin, Texas." *Sheyna Treiber LinkedIn Profile* (archived Jan. 22, 2025), perma.cc/8WW2-DH5K. Angie Wimberly, Supplier.io's designer, lives and works in "Austin, Texas." *Angie (Strickland) Wimberly LinkedIn Profile* (archived Jan. 22, 2025), tinyurl.com/2nn4trjm.

B—lives in this district, does business in this district, suffered discrimination in this district, and would apply for and participate in the program in this district.

21.    Venue is proper in this district. American Airlines and Supplier.io "reside" here. 28 U.S.C. §1391(b)(1). A "substantial part of the events" occurred here. §1391(b)(2). The program "is administered in this judicial district." *American Airlines*, 2025 WL 225127, at *18. And Defendants' ties to the district—and the State—are "sufficient to subject [them] to personal jurisdiction." §1391(d), (b)(1).

22.    The Alliance itself is headquartered in Texas. And nearly half the lawyers on this case reside in Texas—Steven Begakis is in Fort Worth, and Gabe Anderson is in Dallas. The remaining attorneys on this case reside in Tennessee (Cameron Norris and Adam Mortara) and Virginia (Tom McCarthy).

# FACTS

## I. American's supplier-diversity program discriminates based on race.

23.    Even in 2025, "DEI [is] foundational to the American Airlines culture" and is "embedded into the fabric" of everything American does. *Diversity, Equity and Inclusion*, American Airlines (archived Jan. 16, 2025), perma.cc/RVV5-548D. To promote those values, American sets "companywide diversity goals" for "any underrepresented positions" in the company. *Progress on Our Diversity, Equity and Inclusion Journey*, American Airlines (Jan. 13, 2022), tinyurl.com/25zwfn6t. And to meet those quotas, American has started several programs that are open to some races but not others. *Id.*

24.    Enter American's supplier-diversity program. Informed by its work with "[t]he Community Council"—a company-wide organization "comprised of seven distinguished Black leaders," *id.*—American crafted its supplier-diversity program, which is "committed to

6

developing a more … diverse supplier base," *2022 Sustainability Report* 39, American Airlines (2022), perma.cc/Q2TV-JYS5. Since its inception, American's supplier-diversity program has contracted with "more than 200 certified diverse suppliers," and has invested "more than $3.6 billion [in] certified women- and minority-owned businesses." *Global Community, Global Commitment* 57, American Airlines (2008), perma.cc/HC2D-QBGC (second quote); *2023 Sustainability Report* 55, American Airlines (2023), perma.cc/VU7U-NXLG (first quote).

25.     Unfortunately, only some races are "diverse" enough to participate in American's program. According to the airline, eligible companies "must be at least 51% owned, operated and controlled by one of these groups: Minority (Black, Asian American and Pacific Islander, Hispanic, Native American), Women, LGBTQ, Disability, [or] Veteran Service-disabled veteran." *Supplier Diversity*. If an applicant doesn't satisfy "th[ose] qualifications," they can't "register" for the program. *Id.*

26.     The rest of American's supplier-diversity webpage confirms that fact. In a section titled, "Who Qualifies," American hyperlinks to an article by the National Minority Supplier Development Council, *id.*—one of the organizations that American "work[s]" with to "facilitate sourcing from qualified, diverse-owned businesses." *2023 Sustainability Report* 55. When a user clicks on that hyperlink, they are directed to the National Minority Supplier Development Council's website. *Supplier Diversity*. Once there, that user quickly learns that a business is "minority" owned—and thus qualifies for American's program—only if it's "owned, managed, and controlled" by someone "who is Asian-Indian, Asian-Pacific, Black, Hispanic, or Native American." *Definition of an MBE*, NMSDC (archived Jan. 14, 2025), perma.cc/YPY4-SZLR. That categorically, and specifically, excludes whites. *Id.* So white-owned businesses are

banned from the supplier-diversity program if they don't fall in one of American's other "diversity" categories. *Supplier Diversity.*

27.    American's advertising reinforces the program's racial requirements. According to American's Vice President for Purchasing, the company's diverse-supplier program "actively focuses on identifying minority … businesses." *American Airlines Named Corporation of the Year by Four U.S. Minority-Supplier Advocacy Organizations*, PR Newswire (Dec. 16, 2010), perma.cc/HM2M-CM8W. The diversity-supplier program accomplishes that task by "build[ing] relationships with small businesses as well as minority, women, LGBTQ, disability, veteran and service-disabled veteran-owned companies." *Supplier Diversity.* "[S]upplier diversity at American" thus includes "minority-owned, women-owned, veteran-owned, service-disabled veteran-owned, disability-owned, and LGBT-owned businesses"—but no one else. *2018 Corporate Responsibility Report* 26, American Airlines (2018), perma.cc/8LVW-RM2U.

28.    Though American has recently scrubbed references to "DEI" from its websites, the supplier-diversity program remains up—and unchanged—today. *See Our Suppliers*, American Airlines (archived Feb. 11, 2025), archive.is/JraTP.

## II. Supplier.io runs American's supplier-diversity program.

29.    Since 2022, Supplier.io has run American's supplier-diversity program. To participate, businesses must register with Supplier.io and consent to its terms of use and privacy policy. *Register Your Company*, American Airlines (archived Feb. 11, 2025), archive.is/eHfLx; *Sign In*, Supplier.io (archived Feb. 11, 2025), archive.is/ATR4s. Once registered, businesses have to use the "Supplier Diversity Database," *Supplier Diversity*, which is "owned and operated by Supplier.io," *User Terms of Service*, Supplier.io (updated Nov. 3, 2022), perma.cc/FZ5V-

9EY5. And when someone uses Supplier.io's database to contract with American, they also have to use its platform to "repor[t]" their business data, "manage" their contracts, and submit additional "supplier information." *Register Your Company*; *User Terms of Service*. So the only way to apply for American's program is through Supplier.io.

30.    When someone applies, Supplier.io enforces American's race requirements. In its subscriber "agreement"—which is "legally binding" and "enforceable"—Supplier.io promises that its services will "perform materially in accordance with" each client's requirements, including the racial ones. *Subscriber Agreement*, Supplier.io (June 20, 2020), perma.cc/4PX7-CM98. So if "the client requires suppliers to select a specific diversity category," Supplier.io will enforce that requirement and "rejec[t]" an applicant if they don't fit into the right "diversity category." *Why Was My Supplier Registration Rejected*, Supplier.io. (archived Feb. 11, 2025), perma.cc/5ZLY-X2S6.

31.    In fact, enforcing those racial requirements is what Supplier.io specializes in. According to the company, its platform is only for "small and diverse businesses." *Supplier Diversity Policy*, Supplier.io (archived Feb. 11, 2025), perma.cc/3VQW-5YD6. The company's "Supplier Diversity Policy" confirms that fact, instructing businesses that Supplier.io's platform is only for "Minority-owned Business Enterprises" and a few other preferred groups. So if an applicant's business doesn't "fit into one of th[ose] categories," they can't "register their companies in [Supplier.io's] portal." *Id.*

### III. American and Supplier.io's program involves contracts.

32.    To enter the supplier-diversity program, applicants must agree to two main contracts. First, applicants must participate in American's reporting program. And second, they must agree to Supplier.io's terms of use and privacy policy.

33.    Under American's reporting program, suppliers must agree to use "certified minority, women, disability and LGBT-owned businesses, and Small Business Administration (SBA)-defined small business concerns, as second-tier subcontractors [and] suppliers." *American Airlines Purchase Order Terms and Conditions* ¶ 18, American Airlines (2018), perma.cc/D7KE-P48H. And to prove they're meeting American's staffing requirements, suppliers have to "provide quarterly reports" that summarize their "supplier diversity efforts." *Id.* Suppliers must also confirm—at least four times a year—that their "suppliers" are "certifi[ed]" as "diverse subcontractors." *Id.* And suppliers have to provide a host of other "diversity, equity and inclusion (DE&I) information," including their total "spend[ing] with diverse businesses." *Register Your Company*.

34.    Other obligations abound. "By creating an account" with Supplier.io—which is the only way to participate in the program—suppliers must agree to the company's "Terms of Use and Privacy Policy." *Tell Us About Your Company*, American Airlines (archived Jan. 16, 2025), archive.is/H8Yc7. Those terms "create a legal agreement directly between [the applicant] and Supplier.io." *Terms of Use*. And those contracts—which every supplier "agree[s] to be bound by"—"affec[t] [their] legal rights" in several ways. *Id.* (cleaned up).

35.     Applicants must agree to Supplier.io's privacy policy. Under that policy, business must let Supplier.io collect a host of sensitive data, including their "technical" information, "business" information, and "personally identifiable" information. *Privacy Policy*, Supplier.io (archived Feb. 11, 2025), perma.cc/F8GU-N5E7 (cleaned up). And once Supplier.io has that data—which it can "retai[n] indefinitely"—it can use that data to "advertise" its products, study business "trends," and conduct "risk assessments." *Id.*

36.     Supplier.io's terms of use impose several other obligations on participating businesses. Businesses must "grant Supplier.io a license to access, use, copy, reproduce, process, adapt, publish, transmit, and display" anything that they post on Supplier.io's platform. *Terms of Use.* They have to waive any legal "claim[s]" against Supplier.io. *Id.* And they must "agree to indemnify, defend, and hold supplier.io˘… harmless" for anything they do on Supplier.io's platform. *Id.* (cleaned up).

37.     After a business agrees to all those contracts, they can enter American's exclusive internal marketplace. *Supplier Diversity.* And once inside, businesses have the "opportunity to compete for [American's] contracts," which have totaled more than $3.6 billion since the program started. *Standards of Business Conduct for Suppliers* 8, American Airlines (archived Feb. 11, 2025), archive.is/U2Ahe; *Global Community, Global Commitment* 57.

## IV. American's program injures the Alliance's members.

38.     The Alliance has members who are being harmed by American's racially discriminatory program, including Members A and B.

39.     Members A and B are members of the Alliance. So are their businesses. Members A and B pay dues, believe in the Alliance's mission, and support this lawsuit.

40.     Members A and B are ready and able to immediately apply to the program.

41.     Members A-B are "able" to apply. *Ne. Fla. Ch. of AGCA v. Jacksonville,* 508 U.S. 656, 666 (1993). They satisfy all the eligibility criteria aside from the racial ones. Member A's company provides hardware, software, and IT products and services, which are all qualifying "products and services" on American's supplier-diversity page. *Supplier Diversity* (cleaned up). And Member B's company provides professional services, which is also on American's list of acceptable "products and services." *Id.* (cleaned up). Businesses like theirs appear in American's database of diverse suppliers.

42.     Members A-B are "ready" to apply. *Jacksonville,* 508 U.S. at 666. Members A and B regularly provide services to for-profit companies and are always looking for more opportunities to expand their businesses, especially with a company as large, prestigious, and well-resourced as American. In early 2025, they reviewed and filled out American and Supplier.io's joint registration form. But they couldn't submit their applications because they don't meet American's racial criteria. As white business owners who don't satisfy any of the program's other "diversity" requirements, Members A and B were excluded because of their race.

43.     Members A and B sincerely want to apply for the program and contract with American. Members A and B have all the necessary information from the applications that they already filled out. They will continue to meet all the program's race-neutral requirements and remain ready to satisfy the program's race-neutral obligations. And though they are currently excluded from the program because of their race, Members A and B would immediately move to participate in it if a court ordered American and Supplier.io to stop discriminating based on race.

44.     Members A and B are pseudonymous because they don't want American or Supplier.io to hold their involvement in this lawsuit against them when awarding contracts. Members A and B also don't want to face reprisal from other businesses or the public for joining the Alliance and opposing race-based affirmative action.

# CLAIMS FOR RELIEF
## COUNT I
### Violation of the Civil Rights Act of 1866
### 42 U.S.C. §1981

45.     The Alliance repeats and realleges each of its prior allegations.

46.     American and Supplier.io are violating 42 U.S.C. §1981 by intentionally excluding Members A and B from contractual relationships because of their race. *American Alliance for Equal Rights v. Founders First*, 2024 WL 3625684, at *3 (N.D. Tex. July 31) (O'Connor, J.). Under §1981, "[a]ll persons within the jurisdiction of the United States shall have the same right … to make and enforce contracts." 42 U.S.C. §1981(a). That law bans private discrimination. *Founders First*, 2024 WL 3625684, at *3. It protects all races. *Id.* And it covers contracts like American and Supplier.io's. *Id.* So American's supplier-diversity program violates §1981 "because [the] program is a contract that discriminates." *Id.*

47.     To begin with, §1981 covers private parties like American and Supplier.io. "Section 1981 covers contracts between government, nongovernmental, and private parties." *Id.* (quoting *Jett v. Dall. Indep. Sch. Dist.*, 798 F.2d 748, 762 (5th Cir. 1986)). It "provides a cause of action" for "private discrimination." *Id.* (cleaned up). And it authorizes "equitable and legal relief" when businesses like American and Supplier.io discriminate "based on race." *Id.* (quoting *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)).

48.    Members A and B fall within §1981's ambit, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald*, 427 U.S. at 298. Titled "Equal rights under the law," §1981 promises "continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.,* 139 S.Ct. 759, 768 (2019). The law secures that promise by protecting the "equal right of all persons … to make and enforce contracts without respect to race." *Domino's*, 546 U.S. at 474 (cleaned up). So §1981 applies regardless of "whether the aggrieved party is black or white." *Founders First*, 2024 WL 3625684, at *3 (quoting *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981)).

49.    The supplier-diversity program is a contract under §1981. "The term contract, as used in §1981, refers to a right in the promisee against the promisor, with a correlative special duty in the promisor to the promisee of rendering the performance promised." *Id.* at *3 n.7 (quoting *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983)). The program fits that definition: It lets businesses enter an exclusive marketplace in exchange for their intellectual property, personal information, a liability waiver, and more. *Id.* And once a business successfully enters American's program, they have the "opportunity to compete for [American's] contracts." *Standards of Business Conduct for Suppliers.*

50.    The supplier-diversity program implicates a right that §1981 protects—the right to "*make* … contracts." 42 U.S.C. §1981(a) (emphasis added). "[A] contractual relationship need not already exist" to trigger §1981 because the law protects "would-be contractor[s] along with those who already have made contracts." *Domino's*, 546 U.S. at 476. So businesses like

American are liable "under §1981 when, for racially motivated reasons, they prevented individuals who 'sought to enter into contractual relationships' from doing so." *Id.* (quoting *Runyon v. McCrary*, 427 U.S. 160, 172 (1976)).

51.     American and Supplier.io are intentionally discriminating against Members A and B. "[P]roof of a facially discriminatory … policy"—or even "a corporate decision maker's express[ed] desire to avoid" contracting with members of a certain race—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here there's both. The program "facially discriminat[es]" against certain white men. *Id.* And Defendants' "corporate decision maker[s]" have expressed a "desire to avoid" contracting with those white men. *Id.* The Alliance, therefore, "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

52.     That Defendants don't discriminate against *all* whites is not a defense. An employer like American can't "discriminate against some [people] on the basis of race"—like white men—"merely because he favorably treats other members" of that race, like white women. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). "So long as the plaintiff's [race] was one but-for cause" of his exclusion, "that is enough." *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1739 (2020); *accord Comcast Corp. v. NAAOM*, 140 S.Ct. 1009, 1019 (2020).

## COUNT II
### Violation of the Civil Rights Act of 1964
### 42 U.S.C. §2000D

53.     The Alliance repeats and realleges each of its prior allegations.

54.        American and Supplier.io are violating Title VI by taking money from the federal government while discriminating against white business owners. Title VI instructs that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. American and Supplier.io "receive federal financial assistance" and have "intentionally discriminated" against Members A-B. *Easley v. Univ. of Tex. at Arlington*, 984 F. Supp. 2d 631, 635 (N.D. Tex. 2013); *accord Alexander v. Sandoval*, 532 U.S. 275, 280 (2001).

55.        The Alliance can sue under Title VI. "[I]t is beyond dispute that private individuals may sue to enforce" Title VI. *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 218 (2022) (cleaned up). And when they sue, private parties can seek nominal damages and equitable relief. *Id.* at 221; *accord Tolbert v. Queens Coll.*, 242 F.3d 58, 74 (2d Cir. 2001) ("[A] plaintiff who has proven a civil rights violation" under §1981 and Title VI "is entitled as a matter of law to an award of nominal damages."); *AAER v. Southwest Airlines Co.*, 2024 WL 5012055 (N.D. Tex. Dec. 6) (holding that the Alliance has standing to seek nominal damages in a similar case).

56.        American and Supplier.io are intentionally "discriminat[ing]" against Members A-B. *See* 42 U.S.C. §2000d; *accord Sandoval*, 532 U.S. at 280. Intentional discrimination is unlawful whenever it fails strict scrutiny. *Harvard*, 600 U.S. at 198 n.2. And the program here fails for the same reasons that American and Supplier.io are violating §1981: Neither defendant can rely on either of the "two compelling interests" that might justify racial classifications, and

their outright ban on certain classes of white business owners is not "narrowly tailored." *Id.* at 207.

57.     The challenged program is also a "program or activity" that receives "financial assistance." 42 U.S.C. §2000d. Under Title VI, the phrase "program or activity" includes "all of the operations" of a recipient whenever federal financial assistance "is extended" to the entire company—or, in the language of Title VI, whenever the assistance "is extended" to the recipient "as a whole." 42 U.S.C. §2000d-4a(3)(A)(i). So "all" of a company's "operations" must be race neutral if the company "as *a whole*"—rather than merely *a part* of that company, like a division—is receiving "Federal financial assistance." *Id.* (emphasis added).

58.     In 2020 and 2022, the CARES Act directed the Secretary of Treasury to "provide financial assistance" to America's airline industry, instructing the Secretary to give up to 44 billion dollars to "air carriers" like American. 15 U.S.C. §9072(a)(1)-(2); *accord* 15 U.S.C. §9092(a)(1). Under that program, American received several multi-billion-dollar "direct payments." *Direct Payments to American Airlines Co.*, USASpending.gov (archived Feb. 7, 2025), perma.cc/MN86-8WBD.

59.     Those payments are "federal financial assistance," 42 U.S.C. §2000d, and American received them "as a whole," §2000d-4a(3)(A)(i). The CARES Act uses the same language as Title VI, dubbing all these payments as "financial assistance." 15 U.S.C. §9072(a)(1)-(2); *accord* 15 U.S.C. §9092(a)(1) (same). And American received that assistance "as a whole." 42 U.S.C. §2000d-4a(3)(A)(i). According to one of the airline's contracts with the government, the "Recipient" of the funds was "collectively" the signatory entity: ("American Airlines, Inc.")

and "its Affiliates that are air carriers as defined in 49 U.S.C. §40102." "Affiliate" was sepa-

rately defined to include "any Person that directly or indirectly controls, is controlled by, or is

under common control with, the Recipient," which includes American. *E.g.*, *Payroll Support*

*Program Agreement*, American Airlines (Apr. 20, 2020), perma.cc/7CZA-NXA2. So the airline

"as a whole" received the funds—a fact that even American concedes. *See id.* (American ac-

knowledging in the contract that all "Recipient[s]" must "comply with … Title VI of the Civil

Rights Act"). *Id.*

60.    The same is true for Supplier.io, which received federal financial assistance as a

whole by, at a minimum, participating in the Small Business Administration's paycheck pro-

tection program under the Coronavirus Aid, Relief, and Economic Security Act. *See Loans to*

*Qurium Solutions, Inc.*, USASpending.gov (archived Feb. 7, 2025), perma.cc/LCX8-DRQR

(showing a "$75,450.81" PPP loan); SBA, *Paycheck Protection Program Borrower Application Form*

7 (revised Mar. 18, 2021) (explaining that, based on regulations implementing Title VI, "all

businesses receiving SBA financial assistance must agree not to discriminate in any business

practice"), perma.cc/626G-6BDV.

# PRAYER FOR RELIEF

61.    The Alliance respectfully asks this Court to enter judgment in its favor and

against Defendants and to provide the following relief:

A.    A declaratory judgment that Defendants' supplier-diversity program violates 42
U.S.C. §1981 and Title VI.

B.    A temporary restraining order and preliminary injunction barring Defendants
from operating the supplier-diversity program, pending further order the Court.

C.    A permanent injunction barring Defendants from seeing or considering race or
ethnicity when operating the supplier-diversity program.

     D.      Nominal damages of $1.

     E.      Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

     F.      All other relief that the Alliance is entitled to.

Dated: February 11, 2025

Respectfully submitted,

*/s/ Cameron T. Norris*

Adam K. Mortara*
  (TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Thomas R. McCarthy*
  (VA Bar No. 47154)
Cameron T. Norris**
  (TN Bar No. 33467)
Steven C. Begakis***
  (ND Tex. No. 95172VA)
Zach Grouev*
  (Fla. Bar No. 1038629)
R. Gabriel Anderson**
  (TX Bar No. 24129302)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice forthcoming
**member of the Northern District of Texas
***member of the Northern District of Texas who resides in Fort Worth

19